IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | |
| v. | **CASE NO. 99-1435 (GAG)** |
| **COMMONWEALTH OF PUERTO RICO, et al.,** | |
| **Defendants.** | |

## OPINION AND ORDER

Over two decades ago the Commonwealth of Puerto Rico and the United States Department of Justice voluntarily entered into a consent decree in this case. The same was intended to constitutionally safeguard the rights of hundreds of persons with mental disability under the Commonwealth's *parens patriae*. Throughout the ensuing years the parties have amended and expanded the agreement. The Court has approved the same and via multiple orders carefully delineated its parameters.

The consent decree, in turn, calls for the appointment of a federal monitor appointed by the Court. Over time, complexities in compliance and providing adequate services to the hundreds of participants with mental impairments led the Court to gradually expand the monitor's office both as to its staff and budget. Today, the office has deputy monitors, legal counsel, mental experts, support staff, as well as multiple consultants. In addition, following a contempt finding late last year, the Court appointed an independent federal auditor to oversee the Commonwealth's management of funds annually earmarked for its Health Department Individuals with Disabilities Division.

One would logically surmise that the principal focus of the consent decree is the rendering of desperately needed services and programs to the participant beneficiaries. For example, former

Health Secretary Dr. Rosa Pérez Perdomo repeatedly accompanied the undersigned and the monitor in visits to homes and centers. In his previous tenure as Health Secretary Dr. Lorenzo González was greatly responsible for promoting and modernizing the transformation of the original agreement into the present JCAP. More recently, former Health Secretary Dr. Ana Rius agreed to the expansion of the number of participants so as to include all persons within the Health Department's tutelage.

To the Court's chagrin, however, such portentous actions are overshadowed by other inconspicuous yet highly detrimental repeated ones. Historically, the Commonwealth, time and time again, has focused its resources to question, challenge and even attack the monitor and his office. There have been four monitors in this case. The first, the late Dr. John McGee. With regards to him the Commonwealth repeatedly questioned his authority to monitor, visit homes and conduct interviews of providers and health department officials without prior notification. Dr. McGee was followed by Dr. Sylvia Fernández. Once again, the Commonwealth incessantly questioned her authority to do exactly what her predecessor did. More so, there came a point in which the Commonwealth insisted that all her requests for documents had to be reviewed and approved by its counsel. The Commonwealth even intended that she enter into a professional services contract with it. To add gasoline to the fire, the Commonwealth filed a motion under Fed. R. Civ. P. 11 against Dr. Fernández when in an official report to the Court she quoted health official and provider statements to the effect they were being pressured not to provide information. Dr. Javier Aceves, next in succession, fared no better. Once again, his authority to conduct unannounced visits, as well as to interview health department officials and providers was consistently questioned. Readily obtaining documents and information again became a constant nightmare.

Every time during the aforementioned instances−and there are many others that have been left out for expediency's sake−the Court and United States Department of Justice have had to step

up to protect the integrity of the federal monitoring process. The particular matter during each occasion was seemingly resolved by the Court, only to resurface like the classic Universal movie monsters that cannot be destroyed. Looking back on a large scale, this has been an unconscionably enormous waste of federal judicial and executive time over the years−hundreds, more likely thousands, of hours and dollars−which also the Commonwealth could have devoted to assisting the participants.

Over the last several months again, and to the Court's extreme disappointment, this cyclical pattern and practice of the Commonwealth has resurfaced. The fourth monitor, Attorney Alfredo Castellanos Bayouth, has fared no better than his predecessors. Since 2014 he has participated in this case first as legal counsel, next as lead deputy monitor and special master, and, finally, acting monitor. The Court appointed him monitor just last December when Dr. Aceves formally stepped down for personal reasons not relevant to the case. Since the beginning of this year as to which only four months have transpired, the Monitor Office's work has been constantly placed in check by the Commonwealth. The authority to access documents from, as well as interview health department officials and providers has been repeatedly hampered and questioned. Surprise inspections and visits have been frowned upon. The role and authority of the Monitor has again been challenged repeatedly. Finally, the integrity and transparency of the Monitor Office staff has been called into question.

During the February 2020 status conference, US Department of Justice Senior Trial Attorney Richard J. Farano quite ably denounced the Commonwealth's *modus operandi*, highlighting the many instances the Monitor's work was in the past highjacked and the ensuing actions taken by the Court. The undersigned fully concurs with counsel Farano's precise and detailed assessment reflected in the conference transcript which in due course will be made part of the record.

**Civil No. 99-1435 (GAG)**

The docket of this case since January is be riddled by countless entries of court orders and motions of the parties and monitor, again addressing the monitor's function and work. *See, e.g.*, Docket Nos. 2684, 2686, 2690, 2709, 2710, 2721, 2722, 2738, 2741, 2744, 2745, 2748, 2749, 2750, 2751, 2752, 2753, 2754, 2760, 2762, 2764, 2771, 2774, 2778, 2780, 2784, 2785, 2787, 2792, 2794, 2798, 2800, 2805, 2807, 2810, 2812, 2821, 2825, 2826, 2827, 2836 & 2839. The Court will not engage in another wasteful exercise of going over one by one. Its rulings are clear to all and are final on the matter. Any future attempt by the Commonwealth to re-litigate the same will be considered vexatious and sanctionable conduct.

The Court will now address the latest Commonwealth's latest filing at Docket No. 2836 and the United States Department of Justice's response at Docket No. 2839. In a nutshell, the Commonwealth objects to the Monitor Office's April 2020 invoice, contending that the same lacks transparency, as well as evidence to support the work performed by the Monitor and his staff, as well as by his consultants. In addition, the Commonwealth claims that the Monitor Office has over billed for its services. The Department of Justice vehemently disagrees, responds with the exact opposite conclusions and asks that the Monitor Office invoice indeed be approved by the Court. The Court wholeheartedly concurs with the Department of Justice, adopts its entire reasoning, and thus approves the monitor's April 2020 invoice.

Certain Department of Justice observations deserve to be highlighted one final time. First, the monitor, his staff and consultants are not Commonwealth employees nor contractors. They are fully deputized federal judicial officers bound by the Code of Judicial Conduct. Those who are licensed attorneys before this Court, just as counsel for the parties, are also bound by the Model Rules of Professional Conduct. As such, they are bound by federal court rather than Commonwealth fiduciary principles and guidelines. Second, the funds deposited annually in the Court Registry to

operate the Monitor Office, are disbursed on a periodic basis by the Court, after it is satisfied that the invoices properly reflect the work performed. This review and audit process is analogous to the Court's frequent review of invoices submitted by counsel appointed under the Criminal Justice Act. Third the funds in the Court Registry are deposited by virtue of the consent decree and ensuing court orders so as to guarantee an entirely independent federal monitor. This is an arrangement which the Commonwealth since the outset agreed. Fourth, the month of April of 2020 was characterized by intense Covid-19 pandemic extraordinary work by all, the Court included. It should thus come as no surprise that the Monitor Office indeed worked beyond the expected normal in order to assure the Court that the participants were guaranteed the best medical alternatives. Fifth, the Monitor alone is assigned the task of effectively managing his staff. Over time he may also cross train staff to perform multiple functions. Finally, the monthly work performed by the Monitor is typical of his counterparts across the Nation in other mental disability consent decree cases, as acknowledged by the Department of Justice. In this case, said work has been expounded because of the Commonwealth's constant challenges, outlined previously. More so, the Court notes that in this case the Monitor as well as his staff and consultants are greatly under-compensated for their intense and draining work, whose only goal is to ensure the Commonwealth's compliance with constitutional mandates, thus safeguarding the sacrosanct lives, health and quality of life of every single participant. A monitoring team composed of experts and counsel from the mainland, plus associated travel and other costs would require a budget at a minimum five times that of the current monitor office. In this respect, the Court has been extremely sensitive to the Commonwealth's precarious fiscal condition over the last decade, even when increases to the Monitor Office budget are warranted. In light of the preceding, the Court will not review past paid invoices, nor the Monitor's flat fee. Likewise, it will not address herein work by monitor staff in other unrelated cases.

**Civil No. 99-1435 (GAG)**

To conclude, amongst my fellow Article III colleagues, it is extremely rare and extraordinary to see challenges to a federal monitor's invoices. More so, like that now presented here. Attacking a federal monitor's integrity and work is disruptive and distractive, more so given that a consent decree case is not a litigious proceeding between the state and monitor. This adds unnecessary and significant costs to the work of counsel and monitor, as well as requires the Court and Department of Justice to devote precious time and effort to unduly address the matter.

A protracted war against any Office of the Monitor cannot serve as a means to an end of preventing or obstructing a monitor from effectively monitoring. This would tantamount to an attack against the judicial function itself.

**SO ORDERED.**

In San Juan, Puerto Rico this 7th day of May 2020.

*s/ Gustavo A. Gelpí*
GUSTAVO A. GELPI
United States District Judge

6